# 25-1905

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 25-1905

——◆◆◆——

AMERICAN COUNCIL OF LEARNED SOCIETIES, *et al.*

*Plaintiffs-Appellants*,

—v.—

MICHAEL MCDONALD, in his official capacity as
Acting Chairman of the National
Endowment for the Humanities, *et al.*,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS

Daniel F. Jacobson
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants American Council of Learned Societies, Modern Language Association, and American Historical Association do not have any parent corporations and no publicly held corporation owns 10% or more of their stock.

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Plaintiffs-Appellants request oral argument.

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT .................................... 5

STATEMENT OF THE ISSUES ...................................... 6

STATEMENT OF THE CASE ........................................... 6

   A. Statutory Background Underpinning NEH's Historical Structure 6

   B. NEH Eliminates Grant Programs and Grantmaking Offices ....... 10

   C. Procedural History ............................................... 11

SUMMARY OF ARGUMENT .......................................... 18

STANDARD OF REVIEW ................................................ 22

ARGUMENT ....................................................................... 22

   I. Plaintiffs Have Standing to Challenge the Elimination of NEH Grant Programs and Program Offices ............................................ 22

      A. The Lost Opportunity to Compete for Funding Is Cognizable Article III Injury ........................................... 22

      B. Defendants' Actions Injure Plaintiffs and Their Members by Denying the Opportunity to Compete for NEH Grant Funds .. 30

   II. The Challenged Agency Actions Are Not Committed to Agency Discretion By Law ............................................... 37

CONCLUSION .................................................................... 49

CERTIFICATE OF COMPLIANCE ............................... 50

CERTIFICATE OF SERVICE ......................................... 51

# TABLE OF AUTHORITIES

**Cases**                                                                 Pages

*A.H. ex rel. Hester v. French,*
  985 F.3d 165 (2d Cir. 2021) ................................................................ 22

*Alix v. McKinsey & Co.,*
  23 F.4th 196 (2d Cir. 2022) ..........................................................28, 29

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.,*
  No. 25-cv-1923, 2025 WL 2615054 (D.D.C. Sept. 10, 2025) ...............26

*Am. Pub. Health Ass'n v. NIH,*
  145 F.4th 39 (1st Cir. 2025) ................................................................ 43

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011) ................................................................ 22

*CC Distribs. v. United States,*
  883 F.2d 146 (D.C. Cir. 1989) .......................................................18, 23

*Child Trends, Inc. v. U.S. Dep't of Educ.,*
  No. 25-cv-1154, 2025 WL 2379688 (D. Md. Aug. 15, 2025) ................26

*Coal. of MISO Transmission Customers v. FERC,*
  45 F.4th 1004 (D.C. Cir. 2022) ..................................................... *passim*

*Conyers v. Rossides,*
  558 F.3d 137 (2d Cir. 2009) ................................................................ 38

*County of Westchester v. HUD,*
  778 F.3d 412 (2d Cir. 2015) ......................................................... *passim*

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ...................................................................... *passim*

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................................ 48

*Diamond Alternative Energy, LLC v. EPA,*
  145 S. Ct. 2121 (2025) ........................................................................ 29

iv

*Erving v. Va. Squires Basketball Club*,
 458 F.2d 1064 (2d Cir. 1972) ................................................................5

*FCC v. Cruz*,
 596 U.S. 289 (2022) ..............................................................................27

*Global Health Council v. Trump*,
 --- F. 4th ----, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025).................24

*Int'l Longshoremen's & Warehousemen's Union v. Meese*,
 891 F.2d 1374 (9th Cir. 1989) ..............................................................25

*Jajati v. U.S. Customs & Border Protection*,
 102 F.4th 1011 (9th Cir. 2024) ............................................................41

*Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*,
 874 F.3d 1226 (10th Cir. 2017)............................................................25

*Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*,
 906 F.3d 215 (2d Cir. 2018) ................................................................22

*Lincoln v. Vigil*,
 508 U.S. 185 (1993) ..........................................................42, 46, 47

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ..............................................................................36

*Mantena v. Johnson*,
 809 F.3d 721 (2d Cir. 2015) ............................................18, 28, 29, 38

*Mount Evans Co. v. Madigan*,
 14 F.3d 1444 (10th Cir. 1994)..............................................................43

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
 87 F.3d 1338 (D.C. Cir. 1996) ............................................................46

*Serrato v. Clark*,
 486 F.3d 560 (9th Cir. 2007)................................................................25

*Shawnee Tribe v. Mnuchin*,
 984 F.3d 94 (D.C. Cir. 2021) ........................................................41, 43

*Teton Historic Aviation Found. v. DOD*,
    785 F.3d 719 (D.C. Cir. 2015) ............................................... 24

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ................................................. 44

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................... 22, 27

*Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020) ................................................. 41

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ................................................................ 39

**Statutes**

5 U.S.C. § 701(a)(1) ....................................................... 15, 19

5 U.S.C. § 702 ......................................................... 3, 37, 47

5 U.S.C. § 704 ................................................................. 3

5 U.S.C. § 706(2)(A) ......................................................... 42

13 U.S.C. § 141 ............................................................... 38

20 U.S.C. § 956(c) ..................................................... *passim*

28 U.S.C. § 1292(a)(1) ........................................................ 4

28 U.S.C. § 1331 .............................................................. 3

National Foundation on the Arts and Humanities Act of 1965,
    Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) ......................... 6

Consolidated Appropriations Act,
    Pub. L. 118-42, 138 Stat. 25 (Mar. 9, 2024) .......................... 9

Full-Year Continuing Appropriations Act,
    Pub. L. 119-4, §§ 1101-08, 139 Stat. 9 (Mar. 15, 2025) ......... 9

## Other Authorities

Scalia, The Doctrine of Standing as an Essential Element of the
Separation of Powers, 17 Suffolk U. L. Rev. 881 (1983) ....................21

## INTRODUCTION

This appeal presents a simple question: where a federal agency offers a grant program within an organization's core expertise, and the organization applies for specific funding opportunities under that program, does the organization suffer Article III injury when the agency unlawfully eliminates the program? The answer is yes. The organization clearly has a "personal stake" in the agency's actions, which is the touchstone for Article III standing, and specifically suffers injury from the lost opportunity to compete for the financial awards.

Every court of appeals to have addressed this issue has concluded the same, holding that the lost opportunity to compete for business—including from the federal government—constitutes injury-in-fact. This Court similarly has held that the lost opportunity to obtain the benefit of a government program gives rise to Article III standing, no matter whether the government would have ultimately awarded the benefit to the plaintiff. Yet the district court below disregarded this wealth of precedent and held that the lost opportunity to compete for financial awards is a "generalized grievance" that cannot support standing. The

district court cited no precedent or other authority for this conclusion, which contravenes settled standing principles.

At issue in this case are grant programs of the National Endowment for the Humanities (NEH), a federal agency established by Congress sixty years ago to provide financial support for humanities organizations and scholars nationwide. Each year, Congress appropriates hundreds of millions of dollars to NEH to implement grant programs that must serve particular statutory purposes. Until April of this year, NEH had offered a wide range of grant programs to serve these statutory purposes, and had maintained various program offices to award and administer different categories of grants. As of March, NEH had announced new funding opportunities under these programs, with the application period already open for some.

But in April, NEH abruptly eliminated 22 different programs and three different program offices. Below, Defendants did not substantively dispute that NEH's elimination of these programs and program offices did not comport with the requirements of the Administration Procedure Act (APA) for reasoned agency decisionmaking. Defendants did not dispute, among other things, that NEH failed to provide reasoned

2

explanations for their actions and did not consider the reliance interests of those impacted.

Plaintiffs in this action—the American Council of Learned Societies, the American Historical Association, and the Modern Language Association—are three of the most distinguished humanities organizations in the nation, whose members are among those severely affected by the program and office eliminations. Plaintiffs collectively have tens of thousands of members, including universities, scholars, and scholarly organizations, and these members have received hundreds of NEH grants. Plaintiffs and their members submitted declarations below attesting to the specific eliminated programs for which they had applied (or would have applied) for new awards, and identified specific harms they suffered from losing the opportunity to compete for the awards. There is nothing "generalized" about the injuries to Plaintiffs and their members, as the district court erroneously held. Plaintiffs and their members are among a limited group of humanities experts that lost a promised opportunity to obtain money to pursue specific humanities projects. They have a very personal stake in the controversy and thus have standing to sue.

The district court further erred in holding that Plaintiffs likely could not bring APA claims challenging NEH's elimination of programs and program offices because those actions were "committed to agency discretion by law" under 5 U.S.C. § 701(2). Because the APA carries a strong presumption of judicial review of agency action, the Supreme Court and this Court have repeatedly made clear that this exception should be interpreted narrowly to apply only in those rare instances where there is "no law to apply" in evaluating an agency's decision. So long as a statute provides some standards to guide an agency's exercise of discretion—including with respect to the expenditure of funds—the agency's decision is subject to APA review, including for compliance with the APA's reasoned decisionmaking requirements that prohibit arbitrary and capricious action.

Here, the relevant statute, 20 U.S.C. § 956(c), enumerates ten statutory purposes that NEH grants programs must serve, and further requires that NEH ensure it maintains programs that provide opportunities to scholars and institutions that have "traditionally been underrepresented." Under binding precedent, these standards and requirements provide "law to apply" in evaluating the agency's exercise

4

of discretion as to which grant programs and program offices to operate. The agency's elimination of particular grant programs and program offices therefore is subject to APA review, and Plaintiffs may challenge NEH's actions as failing to meet the APA's reasoned decisionmaking requirements.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because certain of Plaintiffs' claims arise under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704. This Court has jurisdiction over the district court's interlocutory order denying Plaintiffs' motion for a preliminary injunction on their claims relating to the elimination of programs and program offices, 28 U.S.C. § 1292(a)(1), which includes jurisdiction to review the "entire order," including the district court's dismissal of these claims. *Erving v. Va. Squires Basketball Club*, 458 F.2d 1064, 1067 (2d Cir. 1972). The

district court entered its order on July 25, 2025 and Plaintiffs-Appellants timely appealed on July 31, 2025. JA 678.

## STATEMENT OF THE ISSUES

I.     Whether Plaintiffs have standing to challenge NEH's elimination of grant programs for which Plaintiffs and their members would have competed for awards, as well as NEH's shuttering of program offices that offered programs for which Plaintiffs and their members regularly competed.

II.     Whether NEH's decisions to eliminate grant programs and program offices are committed to agency discretion by law, where the relevant statute provides specific standards for the grant programs that NEH must offer.

## STATEMENT OF THE CASE

### A.     Statutory Background Underpinning NEH's Historical Structure

Congress created NEH sixty years ago through the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA" or "the Act"). Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60). In establishing NEH, Congress enumerated specific purposes that NEH was to serve, including "to complement, assist, and

6

add to programs for the advancement of the humanities . . . by local, State, regional, and private agencies and organizations." 20 U.S.C. § 951(5). Congress tasked NEH with, among other things, ensuring that Americans "recognize and appreciate the aesthetic dimensions of our lives, the diversity of excellence that comprises our cultural heritage, and artistic and scholarly expression." *Id.* § 951(7).

In furtherance of these ends, Congress directed NEH to "enter into arrangements," including "contracts, grants, loans, and other forms of assistance," to fund humanities projects. *Id.* § 956(c). Congress delineated ten different purposes that these financial awards must serve, including to "initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities"; "initiate and support training and workshops in the humanities"; "support the publication of scholarly works in the humanities"; "initiate and support programs and research which . . . reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community"; "foster international programs and exchanges"; ensure that humanities programs "will also be available to our citizens where

such programs would otherwise be unavailable due to geographic or economic reasons"; and "provide access to, and preserve materials important to research, education, and public understanding of, the humanities." *Id.*

Congress further specified that, "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under [§ 956(c)], the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.*

Until this year, NEH historically maintained a robust organizational structure to effectuate Congress's directives. NEH employed roughly 180 staff members and several program offices that ran grant programs, including but not limited to the Office of Digital Humanities, the Office of Data and Evaluation, and the Office of Challenge Programs. *See* JA 72, 79-81, 388. Each of these offices and divisions performed work critical to meeting NEH's statutory mandates.

This structure allowed NEH to play a significant role in furthering its statutory purpose by both expanding access to the humanities and funding a wide range of research, professional development, and

8

education. Indeed, "[a]s the largest federal funder of the humanities," NEH had until this year offered "47 grant programs to support museums, historic sites, colleges, universities, K-12 teachers, libraries, public television and radio stations, research institutions, independent scholars, and nonprofits nationwide." NEH, Grants, https://perma.cc/282U-ENAJ (archived Apr. 30, 2025).

Congress has consistently funded NEH generally and its grantmaking programs in particular through annual appropriations. In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, of which it required that $192,000,000 "shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) (the "2024 Appropriations Act"). Thus, Congress provided $192,000,000 for awards to further the enumerated purposes under § 956(c), as well as for administrative support. On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds appropriated to NEH in 2024, with the same breakdown in designated expenditures. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing

9

Resolution"). NEH thus received an additional $207,000,000, including an additional $192 million for grants and other assistance programs under § 956(c).

### B. NEH Eliminates Grant Programs and Grantmaking Offices

In March 2025, shortly after the White House terminated NEH Chair Shelly Lowe, two operatives from the Department of Government Efficiency ("DOGE") arrived at NEH. JA 387 ¶ 2; JA 390-91 ¶ 8. The DOGE operatives quickly terminated the vast majority of existing NEH grants, nearly 1,500 in total. *See* JA 384-85 ¶ 2; JA 387 ¶ 3; JA 536 ¶ 1.

Shortly thereafter, NEH began eliminating numerous prospective grant programs for which NEH had already solicited and begun accepting applications for new awards, or for which NEH had announced specific dates in 2025 on which applications would become available. NEH effectuated each program elimination by closing the Notice of Funding Opportunity (NOFO) that had been posted online for the program and stating that the program was "cancelled" (for programs where the application period had already opened) or would not be "reoffered" (for those where the application period had not begun). *See* JA 330-38. In total, NEH eliminated 22 distinct grant

programs that effectuated Congressional priorities and purposes. JA 322-38, 552-563.

Around the same time, NEH also eliminated entire offices that offered and ran grant programs. NEH terminated all or nearly all staff—and eliminated all grant programs—of the Office of Digital Humanities, the Office of Data and Evaluation, and the Office of Challenge Programs. JA 391-92 ¶¶ 10-11; JA 385 ¶ 3; JA 388 ¶ 4; JA 391 ¶ 10.[1]

C.    Procedural History

On May 5, 2025, Plaintiffs the American Council of Learned Societies (ACLS), the American Historical Association (AHA), and the Modern Language Association (MLA) brought this action on behalf of themselves and their members.

ACLS is a nonprofit organization whose members include 81 scholarly organizations, JA 26 ¶ 12, including the American Academy of Arts and Sciences, the American Philosophical Association, and the American Musicological Society, JA 46 ¶ 95, as well as universities

---

[1] In total across NEH, the agency terminated 65-75% of all staff via a "Reduction-in-Force." JA 393-94 ¶ 19; JA 388 ¶ 4; JA 385 ¶ 3.

including each of the University of California's nine campuses, JA 442 ¶ 11, the University of Minnesota, JA 497 ¶ 2, and Georgetown University, JA 486 ¶ 2. ACLS members have received 144 NEH awards since NEH's founding. JA 27 ¶ 12. AHA has over 10,400 historian members around the world, including faculty at many universities such as the University of Wisconsin-Madison, JA 469 ¶ 2, and the University of Richmond, JA 522 ¶¶ 1, 3. AHA and its members have received over 300 NEH awards over the last five years. JA 27 ¶ 13. MLA has over 20,000 members, who have received over 180 NEH awards over the last three years. JA 27-28 ¶ 14. MLA's members include many universities as well, such as the University of Oregon, JA 506 ¶ 2, and Cornell University, JA 586 ¶ 2.

In total, Plaintiffs and their members have received millions in NEH grants over the years. *See* JA 351- 354 ¶¶ 9-17. JA 362 ¶ 9. JA 371 ¶ 7. Through grants to Plaintiffs and their members, projects funded by NEH ranged from supporting broad, national-focused projects such as a national initiative on graduate education in the humanities, JA 351 ¶ 9, and a national census of higher education enrollments in modern languages, JA 371 ¶ 7, to projects focused on more specific

interests, such as a grant to upgrade and sustain a database documenting the history of British theater, JA 507 ¶ 6. Consistent with Congressional mandates, NEH has funded a broad range of Plaintiffs' and Plaintiffs' members projects, large and small.

In their complaint, Plaintiffs asserted two categories of claims: (1) "Institutional Claims" challenging, among other things, the elimination of entire grant programs and grantmaking program offices;[2] and (2) "Grant Termination Claims" challenging the termination of grants held by Plaintiffs and their members. JA 22-67. This appeal concerns only the Institutional Claims that challenge the elimination of programs and program offices.[3]

---

[2] In the district court, Plaintiffs challenged additional institutional actions at NEH, including the firing of staff, the spending of funds on a "Garden of Heroes," and the impoundment of appropriations. JA 628. On appeal, Plaintiffs limit their "Institutional Claims" to the elimination of NEH grant programs and program offices. Plaintiffs do not seek review of the district court's disposition of other aspects of their Institutional Claims.

[3] On May 12, 2025, the Authors Guild and several individual grantees filed a separate lawsuit as a class action challenging NEH's termination of grants. On May 14, 2025, the district court consolidated Plaintiffs' case with *Authors Guild*. JA 541-542. Because the *Authors Guild* plaintiffs assert only grant termination claims, *Authors Guild* is not part of this appeal.

On May 14, 2025, Plaintiffs filed a motion for a preliminary injunction on both sets of claims, and Defendants thereafter moved to dismiss all of the claims. Plaintiffs submitted 21 declarations from themselves and their members, detailing among other things the specific eliminated programs for which they had applied or intended to apply, the eliminated program offices with which Plaintiffs have closely collaborated, and the harms Plaintiffs and their members were suffering due to NEH's actions. JA 348-83, JA 439-535, JA 537-40.

With respect to the eliminated programs in particular, Plaintiffs and their members attested in declarations that they had applied for, or would have applied for, grants under the following 18 now eliminated grant programs: Archaeological and Ethnographic Field Research, JA 595 ¶ 4; Cultural and Community Resilience, JA 595 ¶ 4; Dangers and Opportunities of Technology, JA 578 ¶4, JA 583 ¶ 5, JA 585 ¶ 5; Digital Humanities Advancement, JA 565 ¶6, JA 578 ¶4, JA 580 ¶ 6, JA 585 ¶ 5, JA 587 ¶ 4, JA 589 ¶ 4, JA 590 ¶ 3, JA 595 ¶ 4; Digital Projects for the Public, JA 580 ¶ 6, JA 585 ¶ 5; Dynamic Language Infrastructure, JA 595 ¶ 4; Fellowship Programs at Independent Research Institutions, JA 565 ¶5; JA 580 ¶ 6, JA 587 ¶ 3; Fellowships Open Books Program,

JA 586 ¶ 3; Humanities Collections and Reference Resources, JA 578 ¶4, JA 580 ¶ 6; Humanities Connections, JA 578 ¶4, JA 590 ¶ 3, JA 595 ¶ 4; Humanities Initiatives at HSIs, JA 590 ¶ 3; JA 595 ¶ 4; Institute for K-12 Educators, JA 566 ¶4, JA 575 ¶ 3; Institutes for Advanced Topics in Digital Humanities, JA 367 ¶26; Institutes for Higher Education Faculty, JA 578 ¶4, JA 582 ¶ 5; Research and Development, JA 578 ¶4, JA 580 ¶ 6, JA 587 ¶ 4; Spotlight on Humanities in Higher Education, JA 572 ¶ 3, JA 574 ¶ 3; State and Impact of the Humanities, JA 567 ¶5, 570 ¶ 2; JA 582 ¶ 5; and Summer Stipends, JA 582 ¶ 5, JA 585 ¶ 5, JA 593 ¶ 6.

Plaintiffs also explained in their declarations the varied harms they suffered from the elimination of the Office of Digital Humanities, the Office of Data and Evaluation, and the Office of Challenge Programs. Plaintiffs, for example, have worked closely with staff from the Office of Digital Humanities on issues relating to bringing the study of humanities to the modern age. *See, e.g.* JA 372 ¶ 8, JA 355 ¶ 21. The Office of Digital Humanities supported—through direct funding and attracting additional funds—essential projects such as the Digital Public Library of America, which provides free access to digital

15

collections across the country. JA 356 ¶ 22. And Plaintiffs and their members intended to use data collected and analyzed by the Office of Data and Evaluation to design solutions to the crisis of falling enrollments across humanities majors. JA 356 ¶ 24.

On July 25, 2025, the district court denied Plaintiffs' motion for a preliminary injunction and granted Defendants' motion to dismiss Plaintiffs' claims challenging the program and program office eliminations. JA 676-77. Plaintiffs had predicated their standing to pursue these claims primarily on the "lost opportunity to compete" for funding, which many courts have found constitutes a basis for Article III standing. But the district court held that Plaintiffs lacked standing to pursue the Institutional Claims for two reasons.

First, the court held that the challenged governmental actions— including the elimination of NEH grant programs and offices—were "not sufficiently traceable to the injury of the allegedly illegal termination of already awarded grants." JA 635. The court stated that "Plaintiffs have not alleged facts tending to show that NEH would have to maintain its current staffing levels or continue all of the programs that were discontinued in order to redress the action that wronged

16

them—the mass termination of awarded grants in violation of the Constitution and the APA." *Id.*

Second, the court noted that Plaintiffs' asserted injury for the program and program office claims was the "loss of an opportunity to compete" for funding, but the court held that this harm was "the sort of 'generalized grievance' about Government agency operations, which courts have consistently held does not, by itself, amount to an injury-in-fact under Article III." JA 636. The court did not cite any authority for this assertion, and did not address any of the precedents that have found a lost opportunity to compete for funds to constitute Article III injury.

In addition to its standing holding, the district court concluded that it also likely lacked jurisdiction over Plaintiffs' APA claims regarding the elimination of programs and program offices because the relevant agency actions were "committed to agency discretion by law." JA 636 n.13 (quoting 5 U.S.C. § 701(a)(1)). The court found it "likely that internal NEH decisions regarding what programs to run and what opportunities to extend" are committed to agency discretion by law. *Id.*

Plaintiffs filed a timely notice of appeal.

17

## SUMMARY OF ARGUMENT

I.    The district court erred in holding that Plaintiffs lacked standing to challenge NEH's elimination of grant programs and program offices.

Numerous courts—including at least three circuits—have held that private parties suffer cognizable injury where they lose the opportunity to compete for business or financial awards, including from the federal government. An organization suffers injury-in-fact where a federal agency deprives the organization of an opportunity to compete for a project for which it was "ready, willing, and able" to compete, *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022) (quotations omitted), even where the organization was not "certain to receive [the award] had it been accorded the lost opportunity," *CC Distribs. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989). This Court, too, has recognized that the "lost opportunity" to obtain a government benefit represents cognizable injury, no matter whether the agency would have "ultimately decide[d]" to provide the benefit to the plaintiff. *Mantena v. Johnson*, 809 F.3d 721 (2d Cir.

2015). These precedents accord with the touchstone of modern standing doctrine: that the plaintiff has a "personal stake" in the litigation.

Plaintiffs plainly have such a personal stake here. Plaintiffs and their members, who have won hundreds of NEH grants over the years, submitted declarations that they had already applied or would have applied for the particular grant programs that NEH eliminated. Plaintiffs and their members thus were ready, willing, and able to compete for grants under the relevant programs, for specific amounts of money to perform specific projects, and NEH unlawfully denied them that opportunity. Likewise, as a direct consequence of Defendants eliminating entire program offices from which Plaintiffs and their members routinely obtained grants, Plaintiffs and their members were "walled off from an entire category of projects for which [they were] qualified, prepared and eager to compete." *Coal. of MISO Transmission Customers*, 45 F.4th at 1016. Plaintiffs have a highly personal stake in challenging NEH's elimination of the relevant programs and offices.

The district court disregarded that precedent and dismissed Plaintiffs' claims for lack of standing because, in the court's view, Plaintiffs presented only a "generalized grievance."

19

But there is nothing remotely "generalized" about Plaintiffs' claims. Plaintiffs and their members are among a limited group of organizations that were ready and able to compete for these humanities programs, and they suffered particularized harms from losing any chance to obtain the funding NEH was going to make available under these programs. The general public certainly did not suffer the same harm.

II.    The district court also erred in concluding that Plaintiffs likely could not bring their APA claims against NEH's elimination of grant programs and program offices because those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(1). Because the APA carries a strong presumption of judicial review, the Supreme Court and this Court have interpreted this exception very narrowly, reserving it for "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *County of Westchester v. HUD*, 778 F.3d 412, 419 (2d Cir. 2015).

Even where a statute affords agencies wide discretion in taking a particular action, the action is *not* "committed to agency discretion by law" for APA purposes so long as the statute provides some standards to

20

guide the agency's decision. For instance, although the Census Act broadly permits the Secretary of Commerce to take the census in "such form and content as he may determine," the Supreme Court held that the question of which questions to put on the census was not committed to agency discretion by law because the Act provides standards requiring the Census to be "accurate" and "fairly account[] for . . . crucial representational rights." *Dep't of Com. v. New York*, 588 U.S. 752, 771-73 (2019).

Here, the statute governing NEH's grant programs, 20 U.S.C. § 956(c), provides far more specific standards than the Supreme Court found sufficient in *Department of Commerce*. NEH's programs must serve ten enumerated purposes, and NEH must further ensure that its programs allow for opportunities to "scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* These standards provide "law to apply" in assessing NEH's exercise of discretion in the grant programs to offer, and therefore Plaintiffs may challenge whether NEH exercised its discretion consistent with the APA's requirements for "reasoned decisionmaking." *Dep't of Commerce*, 588 U.S. at 773 (quotations omitted).

21

## STANDARD OF REVIEW

The standard of review of the district court's denial of Plaintiffs' motion for a preliminary injunction is abuse of discretion. *A.H. ex rel. Hester v. French*, 985 F.3d 165, 175 (2d Cir. 2021). A district court abuses its discretion where it "bases its decision on an error of law or uses the wrong legal standard." *Id.* The standard of review for the district court's dismissal for lack of standing is *de novo*. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

## ARGUMENT

### I. Plaintiffs Have Standing to Challenge the Elimination of NEH Grant Programs and Program Offices

#### A. The Lost Opportunity to Compete for Funding Is Cognizable Article III Injury

To establish Article III standing, a plaintiff must establish injury, traceability, and redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). But the core question at the heart of "[s]tanding doctrine" is simple: whether a litigant has a "personal stake" in the litigation. *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018) (citation modified). "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423 (quoting

Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)).

1.     Courts have long held that parties have a personal stake, and thus have standing, where they have lost an opportunity to compete for funds. "[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *CC Distribs.*, 883 F.2d at 150. To establish standing, a plaintiff "need only show that (1) it was ready, willing and able to perform the [projects] for which it wished to compete, and (2) the challenged action deprived the [plaintiff] of the opportunity to compete for the work." *Coal. of MISO Transmission Customers*, 45 F.4th at 1015 (quotations omitted). And a plaintiff suffers injury even when it cannot "point to one specific project it has been deprived of an opportunity to compete for," if "it has been walled off from an entire category of projects for which it is qualified, prepared and eager to compete." *Id.* at 1016.

Courts have consistently applied these principles in the context of a lost opportunity to compete for an award or benefits from the federal

government. In *CC Distributors*, private contractors challenged the elimination of a federal program that allowed them to bid for Department of Defense contracts. 883 F.2d at 148–49. The D.C. Circuit, relying on a long "line of authorities," held that the plaintiffs had standing due to their lost "opportunity to compete for such contracts" under the eliminated program, even if they had "no right to obtain a . . . contract. *Id.* at 150.

Likewise, in *Teton Historic Aviation Foundation v. Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015), a nonprofit that previously competed at Department of Defense auctions for surplus government aircraft parts sued when the agency stopped holding the auctions. The D.C. Circuit held that the nonprofit suffered injury from losing any "chance" to "compete in future public auctions," and that injury was redressable even though there was no guarantee the agency would hold more auctions if the plaintiff won the case. *See id.* at 724-25.

Even more on point, in *Global Health Council v. Trump*, --- F. 4th ----, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025), the D.C. Circuit held that organizations that previously won contracts and grants from two federal agencies had standing to challenge the agencies' refusal to

24

spend appropriated funds for which the plaintiffs planned to compete. 2025 WL 2480618, at *4–5. The court reaffirmed the principle that a plaintiff "may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete," and held that the plaintiffs had standing because "the prospect of competing for funds . . . would [at least] partially redress the injuries to the grantees' finances." *Id.* at *5.

Other circuits have joined the D.C. Circuit in holding that the lost opportunity to compete for business is cognizable harm. The Ninth Circuit has held, for example, that a labor union had standing to challenge government policy allowing foreign crane operators to work in the United States, because "allegations of injury resulting from lost opportunities to compete for economic benefits are sufficient for standing purposes." *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1379 (9th Cir. 1989); *see also Serrato v. Clark*, 486 F.3d 560, 566 (9th Cir. 2007). The Tenth Circuit has similarly held that not being able "to compete for [a] contract" from a federal agency can constitute irreparable harm. *Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017).

25

Yet more district courts have held that the lost opportunity to compete for federal contracts and grants is cognizable harm, including in recent cases challenging an agency's elimination or alteration of grant programs for which the plaintiffs wished to compete. *See, e.g.*, *Child Trends, Inc. v. U.S. Dep't of Educ.*, No. CV 25-1154-BAH, 2025 WL 2379688, at *10 (D. Md. Aug. 15, 2025) (granting summary judgment to plaintiffs challenging the elimination of two Department of Education programs, based on lost opportunity to compete); *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, No. 25-CV-1923 (JMC), 2025 WL 2615054, at *14 (D.D.C. Sept. 10, 2025) (finding standing based on same injury for claims challenging changes to National Science Foundation priorities for its grant programs).

Against the backdrop of this consistent body of authority, neither Defendants below nor the district court cited any decision holding that a lost opportunity to compete for business or financial awards is insufficient to support Article III standing. And adopting the district court's view would create a circuit split with every other circuit to have considered the issue.

Bedrock standing principles militate against going out on that limb. An organization or individual that has applied for an award or benefit under a particular government program, or that can credibly attest that it would have applied, clearly has a "personal stake" where the government cancels the program. *TransUnion*, 594 U.S. at 423. On the question of "What's it to you?", *id.* (quotations omitted), the answer is that the government has deprived the plaintiff of any chance of obtaining the money that the plaintiff could have obtained. And because this Court must "accept as valid the plaintiffs of [plaintiffs'] legal claims" in assessing standing, *FCC v. Cruz*, 596 U.S. 289, 298 (2022), the injury to the plaintiffs is being *unlawfully* deprived of any chance of obtaining funding for which the plaintiff was ready and able to compete.

2.     This Court has applied these principles in similar cases. Although this Court has not squarely addressed whether the lost opportunity to compete for contracts or grants gives rise to Article III standing, this Court has found injury in other types of "lost opportunity" cases. This Court has held both that: (1) the lost opportunity to obtain a government benefit constitutes Article III

injury; and (2) the lost opportunity to compete for business can be an actionable injury where injury is a statutory element of a claim.

First, in *Mantena v. Johnson*, 809 F.3d 721 (2d Cir. 2015), this Court held that a noncitizen had standing to challenge the government's disqualification of her green card application. The plaintiff alleged that the government failed to provide her notice of the revocation of a visa that her former employer had obtained for her, which led to the automatic denial of her green card application. *Id.* at 723. The government "vigorously contest[ed]" the plaintiff's standing, but this Court held that "even if USCIS ultimately decide[d] not to grant Mantena a green card the lost opportunity is itself a concrete injury—and a favorable decision would redress it." *Id.* at 730-31.

Second, in *Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir. 2022), this Court held that a "lost opportunity to compete . . . in an unrigged market" constituted actionable injury under the civil RICO statute. *Id.* at 200. The plaintiff was a bankruptcy consulting company that sued competitors for alleging committing fraud in obtaining business. The district court had determined that the plaintiff had not adequately pleaded that the fraud caused the plaintiff injury, because it was too

28

"speculative" that the plaintiff would have won more business but for the fraud. 404 F. Supp. 3d 827, 836 (S.D.N.Y. 2019); *see also id.* (holding that the "mere expectation" of obtaining business did not suffice). This Court reversed, explaining that the relevant injury was not any actual lost business, but rather "the lost opportunity to compete" for business, where the defendant's alleged conduct had "excluded" the plaintiff from being able to compete. 23 F.4th at 210.[4]

If the lost opportunity to obtain a green card by "itself" confers standing even if the government would deny it, *Mantena*, 809 F.3d at 731, and if the lost opportunity to compete for business is sufficient injury to sustain a RICO claim, *Alix*, 23 F.4th at 210, then the lost opportunity to compete for government grants necessarily constitutes injury-in-fact as well.

---

[4] The Supreme Court also recently suggested that a denial of "the opportunity to compete in the marketplace without government interference" may give rise to Article III standing, but the Court ultimately did not resolve the issue because it found standing on another basis. *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025).

**B.** **Defendants' Actions Injure Plaintiffs and Their Members by Denying the Opportunity to Compete for NEH Grant Funds**

Plaintiffs established Article III standing on behalf of themselves and their members based on the lost opportunity to compete both for the NEH grant programs that were eliminated, and for future programs that the eliminated program offices would have offered.

1. Plaintiffs established their injuries by submitting unrebutted, sworn declarations that they and their members were "ready, willing and able to compete" for grants under the eliminated programs and from the eliminated program offices generally. *Coal. of MISO Transmission Customers*, 45 F.4th at 1015 (quotations omitted). With respect to the specific programs that were eliminated, Plaintiffs and their members attested that they had applied or would have applied for the programs. *See, e.g.*, JA 46 ¶ 94, JA 47 ¶ 99, JA 49 ¶ 104, JA 51 ¶ 111, JA 367 ¶ 26, JA 357–58 ¶¶ 25–28, JA 564 ¶ 3–4, JA 566 ¶ 3, JA 568–73. In total, Plaintiffs and their members submitted declarations demonstrating that they would have competed for 18 of the 22 eliminated grant programs. JA 367–68, JA 564–595.

For example, Plaintiff American Historical Association had already applied for a $250,000 grant from the "Advanced Topics in the

Digital Humanities" program when NEH canceled the funding opportunity as part of its broader elimination of the Office of Digital Humanities. JA 47 ¶ 99, JA 367 ¶ 26. Plaintiff Modern Language Association was similarly in the process of applying for a $150,000 grant from the "Dangers and Opportunities of Technology" program, also in the Office of Digital Humanities, to support a proposal on "AI and the Future of Languages." JA 568 ¶ 2. And members of the American Council of Learned Societies had "grant proposals in the pipeline for projects that ranged from seminal work on archives from the Vietnam war . . . ; ways to preserve a collection of Jewish music . . . ; and the creation of an app to support learning about Afro-Black Paris" before those funding opportunities were canceled. JA 580 ¶ 6; *see also*, *e.g.*, JA 46 ¶ 94, JA 49 ¶ 104, JA 51 ¶ 111, JA 357–58 ¶¶ 25–28, JA 564 ¶ 3–4, JA 566 ¶ 3, JA 568–73.

All of these Plaintiffs and members have a clear "personal stake" in NEH's unlawful elimination of these programs. They applied for or would have applied for specific dollar amounts in grants, to carry out specific projects, and NEH's unlawful actions have forever deprived Plaintiffs and their members of the opportunity to obtain those funds. If

31

an individual applied for a job or a student applied to a college and the opportunity to apply were arbitrarily taken away, that individual or student undoubtedly would have standing based on the lost opportunity, regardless of whether they would have ultimately succeeded in applying. The same holds true here. Plaintiffs have suffered an injury-in-fact by being denied the opportunity to pursue grants from the eliminated programs, that injury is fairly traceable to Defendants' decisions to eliminate the programs, and the injury would likely be redressed by a favorable decision setting aside Defendants' decisions to eliminate the programs.

Although the lost opportunity to obtain grant money alone establishes Plaintiffs' standing, Plaintiffs and their members established additional harms that flow directly from the program eliminations. One university explained that the "cessation of funding opportunities . . . [would] seriously impact the scholarly development of our individual humanities faculty members and research staff." JA 581 ¶ 9. Another noted that faculty "have had to modify their plans for funding and research in light of the NEH grant programs' cancellation" and that the program terminations "have disrupted research

trajectories and future avenues of research" for [the school's] scholars …
causing "lasting professional and institutional harm." JA 585 ¶ 7. And
individual researchers explained that without the grant programs, they
would not be able to undertake projects to which they had already
devoted substantial time and effort. JA 568–73. For universities and
their scholars, these harms are all too real.

Plaintiffs and their members also demonstrated injury from the
elimination of entire program offices, and in particular the Office of
Digital Humanities, the Office of Data and Evaluation, and the Office
Challenge Programs. As described, NEH eliminated each of these
offices' grant programs and terminated all or nearly all the staff that
worked in these offices. When Plaintiffs submitted declarations
asserting that NEH was permanently shutting down these offices, JA
392 ¶ 11, JA 385 ¶ 3, Defendants did not dispute those assertions.

As with the eliminated programs, Plaintiffs and their members
suffer injury from the lost opportunity to compete for future grant
programs that would have been offered by these offices. Plaintiffs and
their members have received grants from these offices for years, and
would have continued to apply for grants from them if they had not

been eliminated. JA 355–56, JA 367–68. Plaintiffs need not "point to one specific project [they have] been deprived of an opportunity to" obtain to maintain standing, where they have "been walled off from an entire category of projects for which [they are] qualified, prepared and eager to compete." *Coal. of MISO Transmission Customers*, 45 F.4th at 1016 (quotations omitted). Here, the elimination of the Offices of Digital Humanities, Data and Evaluation, and Challenge Programs has "walled off" Plaintiffs from "the entire category of projects" that these program offices would offer. That is injury-in-fact.[5]

    **2.**    Neither of the two reasons that the district court provided for finding that Plaintiffs lack standing were sound.

---

[5] Plaintiffs described additional harms in their declarations from the shuttering of these offices. Plaintiff ACLS benefited from regular contact with experts in the Office of Digital Humanities, who introduced ACLS to new methods for conducting research. JA 52 ¶ 121. The office's support for open-access publishing also provided a model for other ACLS programs supporting broader access to humanistic scholarship. JA 356 ¶ 23. And with the elimination of the Office of Data and Evaluation, Plaintiffs and their members will lose out on data and research on humanities education in the United States that would have helped Plaintiffs' members address falling enrollments in humanities majors. JA 356 ¶ 24.

First, the district court held that Plaintiffs lacked standing because the challenged governmental actions "are not sufficiently traceable to the injury of the allegedly illegal termination of already awarded grants." JA 635. But that misunderstands the nature of Plaintiffs' alleged injury. Plaintiffs' injury underlying their claims on the elimination of programs and offices is *not* the "termination of already awarded grants." That is the injury underlying Plaintiffs' separate "Grant Termination Claims," which are not at issue in this appeal. The injury that Plaintiffs consistently asserted below for their program and office elimination claims is the lost opportunity to *compete* for *future* grants from the eliminated programs and offices, which has nothing to do with the harms from the termination of existing grants.

Second, the district court did acknowledge Plaintiffs' lost opportunity to compete theory, but the court characterized this harm as a "generalized grievance" not cognizable under Article III. JA 636. A "generalized grievance," however, is one where the plaintiff "claim[s] only harm to his and every citizen's interest in proper application of the Constitution and laws, and seek[s] relief that no more directly and tangibly benefits him than it does the public at large." *Lujan v. Defs. of*

35

*Wildlife*, 504 U.S. 555, 573-74 (1992). That does not remotely describe Plaintiffs' claims, which challenge the elimination of specific humanities programs to which Plaintiffs had applied or would apply. Plaintiffs and their members are among a small cohort of entities and individuals who would or could apply for these programs, and Plaintiffs and their members would apply to perform very specific projects under the programs.

Members of the "public at large" could not show that they were ready, willing, and able to apply for these NEH grant opportunities. The public at large thus does not suffer the concrete injuries that Plaintiffs and their members suffer from being unable to compete for these programs. Indeed, Plaintiffs and their members have received hundreds of NEH grants in the past, JA 26-27 ¶¶ 12-14, and undoubtedly would have continued to receive grants from the programs and offices had they not been eliminated. The district court did not address any of these facts, as its holding that Plaintiffs asserted a "generalized grievance" came in a single sentence without elaboration. JA 636.

The district court also did not cite any precedent or other legal authority for this conclusion, and it did not address the many contrary

precedents holding that the lost opportunity to compete for business is an Article III injury. *Supra* Section I.A. The court addressed only this Court's *Mantena* decision concerning the denial of a green card application, which the district court distinguished on the basis that the plaintiff alleged the "loss of a concrete opportunity" because he "was already engaged in a formal adjudicatory process." JA 636. But nothing in *Mantena* or any of the other lost-opportunity cases suggest that a plaintiff must have already begun the process of formally applying for an opportunity to challenge government actions depriving plaintiffs of that opportunity. And in any event, Plaintiffs here such as the American Historical Association *had* already applied for a grant program that was eliminated. JA 47 ¶ 99, JA 367 ¶ 26.

## II. The Challenged Agency Actions Are Not Committed to Agency Discretion By Law

The district court also erred in concluding that Plaintiffs' claims regarding the program and program office eliminations were likely also precluded because "NEH decisions regarding what programs to run and what opportunities to extend" are "'committed to agency discretion by law.' JA 636 n.13 (quoting 5 U.S.C. § 701(a)(2)).

This Court should reach this issue rather than leaving it to remand. Although the district court did not elaborate on its conclusion given its standing holding, *see id.*, this determination is an independent basis upon which the district court would deny a preliminary injunction and dismiss Plaintiffs' claims. The issue is purely legal, and it would be highly inefficient and inequitable to Plaintiffs if this Court were to reverse on standing grounds only to have the district court again deny Plaintiffs' preliminary injunction motion (filed in May) and dismiss these claims on this alternative basis. Accordingly, "[i]n the interest of judicial economy on remand," this Court should reach the question of whether the challenged agency actions are committed to agency discretion by law, and hold they are not. *Mantena*, 809 F.3d at 730 (addressing and finding standing where district court had dismissed on another basis).

1. The APA carries a "strong presumption that Congress intends judicial review of administrative action." *Westchester*, 778 F.3d at 418–19 (quoting *Conyers v. Rossides,* 558 F.3d 137, 143 (2d Cir. 2009)). This strong presumption is reflected in 5 U.S.C. § 702, which provides that any party "aggrieved by agency action" is "entitled to

judicial review thereof." The APA provides only two circumstances where courts may find this strong presumption overcome, one of which is where the challenged actions are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

The Supreme Court has repeatedly emphasized that § 701(a)(2) must be read "quite narrowly." *Dep't of Com.*, 588 U.S. at 772 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Because the APA explicitly instructs courts to set aside agency actions that reflect an "abuse of discretion," 5 U.S.C. § 701(a)(2), the Supreme Court has rejected the notion that "all matters committed to agency discretion" are "unreviewable." *Weyerhaeuser*, 586 U.S. at 23. Rather, as this Court has reaffirmed, § 701(a)(2) "applies only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Westchester*, 778 F.3d at 419. Such "rare circumstances" include "a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Com.*, 588 U.S at 772 (cleaned up).

*Department of Commerce* is especially instructive. The plaintiffs there brought an arbitrary-and-capricious challenge to the Secretary of Commerce's decision to include a citizenship question on the Census. Even though the Census Act conferred "broad authority on the Secretary" to take a decennial census in "such form and content as he may determine," 588 U.S. at 771 (quoting 13 U.S.C. § 141), the Supreme Court held that other aspects of the Act provided sufficient standards against which to evaluate whether the Secretary had engaged in "reasoned agency decisionmaking," *id.* at 773. In particular, because the Act mandated a population count for use in apportioning representatives, the Act implicitly "impose[d] a duty to conduct a census that is accurate and that fairly accounts for . . . crucial representational rights." *Id.* at 772-73 (quotations omitted). That duty provided a sufficient standard to review the Secretary's decision and whether it met "the general requirements of reasoned agency decisionmaking." *Id.* at 773.

Following *Department of Commerce*, courts of appeals have consistently found that discretionary agency decisions are subject to APA review where there are statutory standards that govern the

40

agency's decisionmaking. For instance, in *Jajati v. United States Customs & Border Protection*, 102 F.4th 1011 (9th Cir. 2024), the Ninth Circuit held that the discretionary decision of the Department of Homeland Security (DHS) on whether to include an individual in a trusted traveler program was not committed to agency discretion by law, because it was "still . . . rooted in a set of requirements or standards that courts can use to assess whether an agency wielded its discretion in a permissible manner." *Id.* at 1018 (quotations omitted). Those standards included "the overarching objective of the program," which was "to facilitate border crossing for a group of low-risk border crossers." *Id.* at 1018-19 (quotations omitted). Such standards, the court explained, "provide courts with 'law to apply,' even if the standards are broad and the decision is otherwise discretionary." *Id.* at 1019; *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020); *Texas v. Biden*, 10 F.4th 538, 551 (5th Cir. 2021); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100-01 (D.C. Cir. 2021) (describing broad standards courts have held sufficient).

The same principles apply to APA review of challenges to agency spending decisions. In *Lincoln v. Vigil*, 508 U.S. 185 (1993), the

41

Supreme Court held that APA review is not available regarding an agency decision on how to allocate a "lump-sum appropriation," for which Congress did not "impose . . . statutory restrictions" on how the funds are to be spent. *Id.* at 194. But the Court made clear that APA review is available where "Congress . . . circumscribe[s] agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 193.

Courts, including this Court, have thus found that § 701(a)(2) does not preclude APA challenges to agency funding decisions where Congress provided some standards to guide the agency's decision. In *Westchester*, this Court reversed a district court dismissal of an APA claim that challenged HUD's denial of a grant application. This Court held that, "[t]o determine the extent of HUD's discretion and whether there is 'law to apply' in this case, we look to the statutory provisions that govern HUD's administration of the relevant grant funds." 778 F.3d at 419. Those statutory provisions delineated standards—albeit very broad ones—to govern the Secretary's decision, including that the Secretary could deny an application if he "determines that the [applicant's] housing strategy is inconsistent with the purposes of [the

42

relevant Act].” *Id.* at 419-20. That standard, among others, was a sufficient “limitation[]” to make the Secretary’s decision not committed to agency discretion by law. *See id.* at 420-21.

The First Circuit likewise recently held that an agency’s grantmaking decisions were not committed to agency discretion by law, where there were “statutory provisions that direct [the agency] to prioritize or to consider certain research objectives.” *Am. Pub. Health Ass’n v. NIH*, 145 F.4th 39, 53 (1st Cir. 2025), *stayed in part on other grounds by* 145 S. Ct. 2658 (2025). Other courts of appeals have similarly found agency spending decisions reviewable where the relevant statute provided standards, such as that the funds were for: “necessary improvements” to property, *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1450 (10th Cir. 1994), and “necessary expenditures” due to COVID-19, *Shawnee Tribe*, 984 F.3d at 94.

In each of these cases, the APA’s strong presumption of judicial review prevailed because the statutory standards, even if broad, provided “law to apply” in evaluating the agency’s funding decisions. Accordingly, the funding decisions at issue in those cases were subject

43

to the APA's requirements for reasoned decisionmaking that preclude arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A).

**2.** As in the above cases, the relevant statutes here provide standards under which NEH must fund and operate the terminated grant programs. Every year, Congress directs that the vast majority of NEH's appropriations "shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c)]." *See, e.g.*, 2024 Appropriations Act, 138 Stat. at 281. In 2024 and 2025, Congress provided successive appropriations of $192 million for carrying out programs under § 956(c), as well as administrative support. *Id.*

Any grants that NEH issues under § 956(c) must serve specific purposes; namely, they must:

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities . . .;

44

(3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals . . . ;

(4) initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

(5) foster international programs and exchanges;

(6) foster the interchange of information in the humanities;

(7) foster, with groups, education in, and public understanding and appreciation of the humanities;

(8) support the publication of scholarly works in the humanities;

(9) insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

(10) foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956(c).

45

Section 956(c) further mandates that, "[i]n selecting individuals and groups" for awards under § 956(c), "the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.*

This directive and the required statutory purposes of § 956(c) awards provide clear standards for, and "limitations" on, the types of grant programs NEH must fund. *Westchester*, 778 F.3d at 420-21. The Secretary must use the sizeable appropriations for § 956(c) to fund programs that serve the ten enumerated purposes, and must ensure that NEH maintains programs that allow for giving particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented. 20 U.S.C. § 956(c). This case thus does not involve a "lump sum appropriation," like the one in *Lincoln*, that affords "unfettered discretion to the agency in its allocation of certain funds." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1347 (D.C. Cir. 1996), *amended* (Aug. 6, 1996) (distinguishing *Lincoln* on this basis).

Indeed, Section 956(c) is far more prescriptive in cabining NEH's exercise of discretion than the Census Act's implicit duty to "conduct a

census that is accurate and that fairly accounts for . . . crucial representational rights," *Dep't of Commerce*, 588 U.S. at 772-73, or the provision that the HUD Secretary may deny funding if he "determines that the [applicant's] housing strategy is inconsistent with the purposes of [the relevant Act]," *Westchester*, 778 F.3d at 419-20. If those statutes provide "law to apply," as the Supreme Court and this Court held, then § 956(c) necessarily does as well.

3.      In concluding that it was likely that Plaintiffs' challenges to the elimination of programs and offices was not subject to APA review, the district court did not evaluate any of the enumerated statutory standards that govern NEH's decisionmaking. Instead, the court suggested that NEH has unfettered discretion "regarding what programs to run and what opportunities to extend." JA 636 n.13. Not only do the above-cited decisions contradict this proposition, but the Supreme Court's decision in *Department of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1 (2020), squarely does as well. There, the Court specifically rejected the notion that an agency's decision to eliminate a discretionary program is committed to agency discretion by law.

47

*Regents* held that the Department of Homeland Security's rescission of the DACA program was arbitrary and capricious. The Court rejected the agency's argument that its decision to eliminate the program was committed to agency discretion by law because it had no obligation to offer the program in the first place. 591 U.S. at 16-19. The rescission of the program was reviewable, the Court held, even though "[a]ll parties agree[d]" that "DHS may rescind DACA" as a legal matter. *Id.* at 16. Because the program provided "benefits" to recipients, "[t]he creation of that program—and its rescission—is an action that provides a focus for judicial review." *Id.* at 18.

As in *Regents*, NEH had no legal obligation to create the programs or offices at issue here, but NEH's establishment—and then elimination—of those programs and offices "provides a focus for judicial review." *Id.* at 18. These programs and offices offered Plaintiffs access to benefits—including grant dollars—and Plaintiffs are "entitled to judicial review" of whether NEH violated the APA's reasoned decisionmaking requirements in depriving them of the opportunity to obtain these benefits. 5 U.S.C. § 702.

\*   \*   \*

48

The district court thus had jurisdiction to review the merits of whether NEH acted in an arbitrary and capricious manner in eliminating the 22 grant programs and three program offices. Although the merits of Defendants' actions are not presented in this appeal, it bears noting that Defendants did not contest the merits of these claims at all below. They did not dispute any of Plaintiffs' arguments that NEH's actions eliminating the programs and offices failed to comport with the APA's reasoned decisionmaking requirement in multiple ways, including in failing to provide a reasoned explanation for their decisions and failing to consider the reliance interests of those impacted by their decisions. *Compare* Pls. Mot. for Prelim. Inj. 11–14, Dist. Ct. Dkt. 25, *with* Defs.' Opp., Dist. Ct. Dkt. 81.

Given that NEH has no substantive defense for its actions of substantial public import, Plaintiffs respectfully request that Court expeditiously reverse and remand so that Plaintiffs may promptly seek a preliminary or permanent injunction on these claims.

## CONCLUSION

The Court should vacate the district court's denial of a preliminary injunction on Plaintiffs' claims challenging the elimination

of programs and program offices, reverse the dismissal of those claims, and remand for further proceedings.

Respectfully Submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148

*Counsel for Plaintiffs-Appellants*

50

## CERTIFICATE OF COMPLIANCE

This brief complies with Local Rule 32.1(a)(4)(A) because it contains 9,514 words. The brief also complies with Rules 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: September 30, 2025                    */s/ Daniel F. Jacobson*

## CERTIFICATE OF SERVICE

I e-filed this brief with the Court, which will email everyone

requiring notice.

Dated: September 30, 2025                    */s/ Daniel F. Jacobson*